2012 VT 79

## State of Vermont v. Jonathan Bruno

[60 A.3d 610]

Nos. 10-119 & 11-166

Present: **Reiber, C.J., Dooley, Burgess and Robinson, JJ., and Kupersmith, Supr. J., Specially Assigned**

Opinion Filed October 5, 2012

Motion for Reargument Denied November 1, 2012

516

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Dawn Matthews*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant was convicted of second-degree murder following a jury trial. He appeals that conviction on three grounds: (1) the trial court improperly denied his motion for a new trial based on a newly discovered witness corroborating defendant's self-defense claim; (2) the trial court erred by failing to dismiss two jurors for cause; and (3) the jury instructions on diminished capacity failed to inform the jury it must acquit defendant of second-degree murder if defendant could not form the specific intent for that offense due to diminished capacity. We affirm.

¶ 2. At trial, defendant testified that his feud with the victim originally began with his sale of forty dollars' worth of heroin to the victim. The victim did not pay for the drugs at that time, but said that he would pay defendant back later. After a few days without payment, defendant became irritated and angry and began calling the victim at his home. The victim's father testified that on October 28, 2007, defendant called for the victim multiple times, screaming vulgarities and threatening the victim's family. The victim's father reported the phone calls to the Castleton police, and an officer came to the victim's home; when defendant called back, the father handed the officer the phone, and the police officer spoke with defendant. Defendant did not call the victim's family again after that.

¶ 3. Defendant testified that on November 1, 2007, he smoked crack at a friend's house and then went to Walmart in the afternoon. That same afternoon, the victim drove with his friend and boss to TD BankNorth, near the Rutland Walmart, in this friend's pickup truck. Defendant and the victim saw each other when the victim was near the bank's drive-through window, and they began speaking. Although defendant and other witnesses offered divergent testimony about who said what, all agree that defendant and the victim began having a heated conversation. According to the friend, defendant said, "Let's go over here behind Walmart and we'll settle this right now, bitch. Your father's not here to call the cops on me this time." Defendant testified that the victim asked *him* to go behind the Walmart.

¶ 4. Defendant and the victim then went behind the Walmart, with defendant in front and the victim following. The friend testified that he followed in his truck, stopping sixty to seventy yards from defendant and the victim. The friend testified that he watched defendant and the victim argue until a tractor-trailer blocked his view. The driver of that tractor-trailer testified that the victim and defendant's altercation took place directly in front of his truck, about fifteen feet away. The driver saw the victim throw the first punch, and then saw what looked like defendant punching the victim in the neck. In fact, defendant had a knife in his hand and slashed the victim's neck, cutting through his larnyx, carotid artery, jugular vein, and esophagus.

¶ 5. The victim, bleeding profusely, ran from the site of the slashing, around the passenger side of the tractor-trailer, and towards the friend's truck. The friend testified that he saw the victim running towards his truck, about fifteen feet in front of him. The friend got out of his truck, ran to the victim, and applied pressure to the wound, but the victim died within minutes. Defendant fled the scene, but police soon found and arrested him.

¶ 6. The State charged defendant with second-degree murder. Defendant did not deny slashing the victim but consistently maintained that the victim came at him with a pipe and that he acted in self defense. None of the other witnesses at trial saw a pipe or other weapon in the victim's hand during the altercation. The police never found a pipe at the scene or in the friend's truck. The friend testified that he did not have any pipes in his truck, only a metal stud eight feet or longer.

¶ 7. Alternatively, defendant argued that his voluntary cocaine intoxication should mitigate the offense from second-degree murder to voluntary manslaughter on the ground of diminished capacity. The jury convicted defendant of second-degree murder, and the court sentenced him to thirty-five years to life. An automatic notice of appeal was entered.

¶ 8. In April 2010, four months after defendant's conviction and a month after his sentencing, a new witness contacted defendant's mother, then defense counsel. This new witness said she was in the Walmart parking lot on November 1, 2007, witnessed part of the altercation between defendant and the victim, and saw the victim holding an object she thought was a pipe. Defendant filed a motion for a new trial based on newly discovered evidence. Following a hearing, the trial court found that the new witness

was not credible, and denied defendant's motion for a new trial. Defendant appealed.

## I.

¶ 9. First, we consider defendant's argument that the trial court erred by denying defendant's motion for a new trial based on the testimony of the newly discovered witness. "Motions for new trial on the ground of newly discovered evidence are not favored by the courts and are viewed with great caution; courts are properly reluctant to grant a second trial once a defendant has had his or her day in court and been fairly tried." *State v. Schreiner*, 2007 VT 138, ¶ 26, 183 Vt. 42, 944 A.2d 250. To succeed on a motion for a new trial based on newly discovered evidence, defendant must prove each of the following elements: (1) new evidence would probably change the result on retrial; (2) the evidence was discovered only subsequent to trial; (3) the evidence could not have been discovered earlier through the exercise of due diligence; (4) the evidence is material; and (5) the evidence is not merely cumulative or impeaching. *Id.* In this case, the trial court determined that the new witness's testimony satisfied elements (2) through (5) of the above test, and the State does not contest those findings here. Accordingly, defendant's appeal focuses solely on the trial court's conclusion that the new witness's testimony would probably not change the outcome upon retrial.

¶ 10. In assessing whether newly discovered evidence would probably lead to a different result upon retrial, the trial court must evaluate the quality of the evidence presented. See *State v. Miller*, 151 Vt. 337, 339, 560 A.2d 376, 377 (1989). Defendant must show that the new evidence would "likely lead to an acquittal of the defendant on retrial." *State v. Charbonneau*, 2011 VT 57, ¶ 17, 190 Vt. 81, 25 A.3d 553; see Reporter's Notes, V.R.Cr.P. 33 ("Both the Vermont and federal cases hold that to permit grant of a new trial, the new evidence . . . must appear likely to bring about an acquittal on a retrial.").

¶ 11. At the new trial motion hearing on December 9, 2010, the new witness testified to the following facts. On November 1, 2007, she parked in the Walmart lot to walk her dog nearby. As she returned to her car with her dog, she saw two men coming towards her, later identified as defendant and the victim. The man who was following behind carried a three or four-foot long silver

object, which looked like a pipe and glinted in the sun like metal. The two came together near the lawn and garden section by the side of the Walmart. She saw the man who had been behind raise the pipe-like object and swing down at the other person, but she did not see it connect. A Walmart truck blocked her view as she drove out of the parking lot. Seconds later, as she was driving, she heard a sound "like metal hitting concrete." Through her rearview mirror, she then saw a dark-colored pickup truck pull up and a man throw the object in the back of that truck. She then drove away and did not see the rest of the incident.

¶ 12. The new witness left the scene on November 1 because she was driving without a valid driver's license and did not want to deal with the police. After she figured out that the two men she had seen were defendant and the victim, she did not report what she saw to the police because she figured there were lots of people downtown and there had to be more than enough witnesses. She also did not want to get involved as a witness because she was afraid of the families involved. After the trial, she told her counselor what she had seen, and her counselor encouraged her to tell somebody. She then contacted defendant's mother who referred her to defense counsel. She did not ever speak to defendant about the matter.

¶ 13. At the time of the incident, she was employed taking care of an elderly patient at the patient's home. She took Suboxone to suppress opioid cravings, but had not taken street drugs since February 2006. She has a history of anxiety, Posttraumatic Stress Disorder, depression, Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, addiction to prescription medication, and was taking medication for anxiety at the time of the hearing. She had once been hospitalized for her mental health issues.

¶ 14. In its ruling on the new trial motion, the trial court found that the new witness's testimony would be admissible at trial but did not find the testimony credible. The court cited her delay in reporting her purported observations, her mental health and substance abuse issues, the inconsistencies in her testimony, and the court's opportunity at the hearing to observe the witness's demeanor, mannerisms, and tone of voice, and to examine the quality of her testimony as a whole. Responding to defendant's assertion that the new witness had no motive to testify falsely, the court acknowledged that it could not with certainty ascribe a specific reason for her to testify falsely, but suggested that she

might have been attempting to assist defendant or that her mental health and/or substance abuse issues might have resulted in her interjecting herself into the case.

¶ 15. The trial court further concluded that even if the new witness's testimony was credible, weighed against the State's evidence, it still would probably not bring about a different result. Although the testimony does undercut a significant aspect of the State's case — namely, that the victim was unarmed and therefore defendant did not act in self-defense — no other witness saw an object in the victim's hand during the altercation, no such item was found by the police at the scene, nor did any other witness see anyone pick up an item and throw it into the back of a truck. In fact, the new witness's testimony was even inconsistent with defendant's own account of how he was attacked. Accordingly, the trial court concluded that the remaining testimony at trial weighed heavily against a finding that her testimony would probably change the result on retrial.

¶ 16. We review the trial court's ruling on the new trial motion for abuse of discretion, and will not overturn the trial court's decision unless the court abused or withheld its discretion. *Charbonneau*, 2011 VT 57, ¶ 16; *Miller*, 151 Vt. at 339, 560 A.2d at 377. Moreover, we recognize that "[a] trial court's assessment of the credibility of both a witness who offers newly discovered testimony and the testimony itself is simply part of the evaluation of the quality of the evidence" that the trial court must undertake in a motion for a new trial based on newly discovered evidence. *Charbonneau*, 2011 VT 57, ¶ 18. See also *State v. Young*, 2010 VT 97, ¶ 23, 189 Vt. 37, 12 A.3d 510 ("The trial court is afforded great discretion in making factual findings because it is in the best position to assess the credibility of witnesses and the weight to be given to evidence.").

¶ 17. Given the record in this case, we cannot conclude that the trial court abused its discretion in concluding that the new testimony was not credible, and that, in any event, it would not likely change the outcome of the trial. The trial court specifically cited a host of factors, including the witness's demeanor, mannerisms, and tone of voice, to support its conclusion. Although we do not generally require the trial court to articulate with specificity the reasons underlying its credibility determinations, *State v. Hagen*, 151 Vt. 64, 65, 557 A.2d 493, 494 (1989), we

have recognized that a witness's "demeanor, mannerisms, and tone of voice" as well as "a judge's discretion and experience," are all factors that are relevant to a trial court's credibility determination. *Id.*

¶ 18. Moreover, weaknesses and inconsistencies in the new witness's testimony also support the trial court's credibility determination. For instance, the trial court could have concluded that the new witness gave inconsistent testimony concerning where precisely the altercation occurred, whether defendant and the victim were running or walking, whether she saw a man pick up an object or just throw an object into the dark-colored pickup truck, and what she was doing when watching the two men. The new witness also stated, "I don't remember every detail that I saw that day . . . I try to forget about this." For all of these reasons, we cannot say that the trial court abused its discretion in concluding that the new witness's testimony was not credible.[1]

¶ 19. The trial court's decision to deny defendant's motion for a new trial is also supportable by its alternate analysis — that even if the new testimony was credible when considered on its own, it would probably not have changed the outcome when viewed in the context of the evidence overall. See *Schreiner*, 2007 VT 138, ¶ 29 ("[W]e look at the newly discovered evidence in relation to the State's case against defendant."). As the court noted, "no other witness saw an object in the victim's hand during the altercation, no such item was found by the police at the scene, nor did any other witness see anyone pick up an item and throw it into the back of the truck." The court's conclusion is amply supported by the record. The disinterested truck driver, who was fifteen feet away from the altercation, with an unobstructed view,

---

[1] The trial court responded to defendant's argument that the witness had no motive to lie by hypothesizing generally about her possible motivations:

> While the Court cannot, with absolute certainty, ascribe a specific reason for her to testify falsely, the evidence suggests that she may, for reasons known only to her, be attempting to assist Mr. Bruno, or that her mental health and/or substance abuse issues have resulted in her coming forward to inject herself into the case.

We agree with defendant that there is nothing in the record to support the trial court's suggestion that the new witness's past drug use or mental health problems led her to make up stories. We view the court's musings as mere hypotheses, and not as grounds underlying the trial court's credibility determination. The court specifically identified a host of other factors to support that determination.

saw no weapon in the victim's hand. The victim's friend, who saw the victim following defendant to the back of the Walmart parking lot, saw no weapon in the victim's hand. A disinterested witness, who watched defendant and the victim from the time the victim began following defendant toward the back of the Walmart parking lot until after the slashing, saw no weapons in either of their hands. Another disinterested witness who saw defendant and the victim arguing immediately before the slashing did not see a weapon in either person's hand. Police officers searched all around the scene of the incident, and also searched the friend's truck and the victim's father's truck. None found a pipe or other object meeting the new witness's description.

¶ 20. In addition, the trial court could reasonably have concluded that in the context of the other evidence in the case, the new witness's testimony simply did not make sense. Construing the new witness's testimony most favorably to the defendant, she testified that she saw the victim swing a pipe, heard it hit the ground seconds later, and then saw a man pull up in a dark-colored pickup truck, pick up the pipe, and throw the pipe into the back of the truck. Presumably this man was the friend of the victim with whom the victim had come to the bank. However, the trial court could reasonably have concluded that this series of events did not make sense when compared to all of the other witness testimony about where the slashing occurred and where the victim died — reinforcing both the court's credibility determination and its conclusion that the new testimony would not change the outcome of the trial.

¶ 21. Several witnesses testified that defendant slashed the victim behind the Walmart, near the Amtrak station, in front of the idling tractor-trailer. The tractor-trailer driver testified that he then saw the victim run from the spot of the slashing, around the side of his truck. Another witness also testified that the victim ran back towards the bank drive-through, and died halfway between the slashing and the bank drive-through. Several witnesses testified that the victim died near his friend's truck, a considerable distance from where the slashing took place. The first police officer at the scene testified that he found blood on cars at the slashing site, a trail of blood from the point of the slashing to the friend's truck, blood on the friend's truck, and a large pool of blood where the victim died. The friend testified that sixty or seventy yards separated his pickup truck from the site of the

slashing. And another disinterested eyewitness saw the victim run to the friend's truck, then saw the friend get out of the truck and immediately help the victim. In short, numerous witnesses testified that a considerable distance separated the spot where defendant slashed the victim and the spot where the victim died in his friend's arms.

¶ 22. Assuming for the sake of argument that the victim did at some point carry a pipe, in light of the above testimony, the friend could have picked up the pipe and thrown it in the back of his truck only in one of two scenarios. First, the victim could have dropped the pipe before reaching the place where defendant slashed him. If so, the friend could plausibly have retrieved the pipe and thrown it in his truck while the victim and defendant squared off some distance away. In this scenario, though, the victim would have been unarmed at the spot where he and defendant came together, and defendant's self-defense claim would fail. Alternatively, the victim could have dropped the pipe during the final confrontation with defendant, supporting defendant's self-defense claim. However, in this scenario, in order to retrieve the pipe, the friend would have had to exit his truck, run to get the pipe, then run back to his truck, in the meantime passing by the victim, who was bleeding profusely from a neck wound. Given the considerable distance between the friend's truck and the site where the pipe would have dropped in this scenario, and given that his friend was clutching his neck and bleeding dramatically, it is difficult to imagine that the friend would have or could have run to the site of the slashing, retrieved the pipe, thrown the pipe in his truck, and only then offered aid to his dying friend, all while escaping the notice of any of the other witnesses.

¶ 23. Finally, as the trial court noted, the new witness's testimony does not even corroborate defendant's version of events, because defendant testified that two men approached him right before he purportedly struck out in self defense, whereas the new witness described seeing only the victim and defendant. Under these circumstances, the trial court did not abuse its discretion by concluding that the new witness's testimony would probably not lead to an acquittal on retrial.

## II.

¶ 24. We next consider defendant's argument that the trial court should have dismissed two jurors for cause.

A.

¶ 25. During the jury draw, defense counsel asked whether jurors would be able to set aside their natural desire to hear both sides of the story in the event that Mr. Bruno did not testify. One juror, E.R., responded, "I would find something lacking if I didn't hear from the defendant." The court briefly interrupted and, in a conversation at the bench, out of the hearing of the jurors, told defense counsel that in answering that question the jurors should be made aware that defendant has a right to not testify. Defense counsel followed up with E.R., asking whether, if the law provides that defendant has no obligation to testify, she could put aside her natural human interest in hearing both sides. The following colloquy ensued:

> E.R.: That's the first time I've heard that, that the defense doesn't have to. It's the first time I've heard . . . that it's the State that is proving his guilt and that the defense is just there. I mean, he's — he's saying he didn't do it, naturally, and so . . . it's the first time that I've really understood it, maybe.
>
> Defense Counsel: Good
>
> E.R.: Okay? So at this point, I can honestly say that I could not set that aside.
>
> Defense Counsel: You — at this point you can't say it?
>
> E.R.: At this point I can't say that — that I could let go of that. I didn't hear his side of the story.
>
> Defense Counsel: Well, why don't you think about it for a minute. I'll change subjects.

¶ 26. Counsel did change subjects and began asking jurors about their feelings relating to drug abuse. Defense counsel asked E.R. whether she would be able to set aside the drug-dealing aspect of the case, despite her personal experiences with drugs, and E.R. said she was not sure that she could. The court followed up, asking her in three different ways whether her feelings about drugs might impair her ability to follow the court's instructions, and whether she could set aside the personal feelings in the back of her mind. Each time she replied that she could. The court

asked her whether she was sure, and again whether she had any doubts. Each time she reaffirmed that she could set aside her feelings and follow the court's instructions. Defendant requested to remove E.R. for cause, arguing that the court had rehabilitated her, and that E.R. was only reassuring the court that she could set aside her feelings in order to be obedient to the court. The court denied the objection, noting that the juror seemed to have had a hard time with the issue when posed through defense counsel's amorphous questions, but that based on his observations, the juror answered his more pointed questions very directly and did not appear to be struggling with the issue. The court stated that defense counsel could question E.R. further through the jury draw, and he suggested that if further facts came out, he would reconsider.

¶ 27. Defense counsel did not question E.R. again. At the end of the questioning, she renewed her request to remove E.R. for cause, acknowledging a "difference of opinion" with the court about the juror. The court asked, "Nothing new?" Defense counsel affirmed, "Nothing new." The court reaffirmed its earlier position. Moments later, defense counsel exercised a peremptory challenge to remove E.R. from the jury, and subsequently exhausted all defendant's peremptory challenges. Upon exhausting defendant's peremptories, counsel noted her motion for the record and indicated that had the court struck E.R. for cause, she would have exercised the peremptory she used on that juror to strike yet another.[2]

¶ 28. On appeal, defendant argues that the court should have dismissed E.R. for cause, both because of her initial acknowledgment that her personal experiences with drugs could make it difficult for her to be objective, and because she was not sure that she could get past her sense that she ought to be able to hear both sides of the story. We consider each challenge in turn.

¶ 29. Criminal defendants have a constitutional right to trial by an impartial jury. U.S. Const. amend. VI; Vt. Const. ch. I, art. 10. We have recognized that "[t]rial courts must safeguard

---

[2] If E.R. should have been dismissed for cause, defendant suffered prejudice by using a peremptory, even though E.R. did not actually sit on the jury. See *State v. McQuesten*, 151 Vt. 267, 269-70, 559 A.2d 685, 686-87 (1989) (prejudice resulted when defendant used peremptory to remove jurors with fixed biases and used all peremptories); *State v. Doleszny*, 146 Vt. 621, 622, 508 A.2d 693, 694 (1986) (same).

this right by excluding from the jury persons who evince bias against the defendant." *State v. Sharrow*, 2008 VT 24, ¶ 6, 183 Vt. 306, 949 A.2d 428. In Vermont, we divide challenges for cause into two categories: "(1) those based on actual bias, and (2) those grounded in implied bias." *Id.* ¶ 7. The former category refers to cases in which a prospective juror demonstrates fixed bias. We have explained, "A prospective juror has a fixed bias when, through his or her answers to questions posed on voir dire, the potential juror evinces a state of mind inconsistent with deciding the case fairly." *Id.* ¶ 8. For example, "A prospective juror's statement that [he or she] may have trouble putting aside . . . prejudices, making a decision based only on the evidence, or applying a burden of proof or law with which [he or she] disagrees indicates fixed bias." *Id.* Accordingly, we have held that a juror who expressed her belief "that a defendant had an obligation to prove his innocence" demonstrated fixed bias. *State v. Holden*, 136 Vt. 158, 161, 385 A.2d 1092, 1094 (1978). On the other hand, "Where a prospective juror has stated that he or she can judge the case fairly, or has at least failed to say that he or she could not, we have been reluctant to conclude that the potential juror had a fixed bias as a matter of law." *State v. Herrick*, 2011 VT 94, ¶ 16, 190 Vt. 292, 30 A.3d 1285.

¶ 30. We review the trial court's decision for abuse of discretion and have recognized that "[t]he trial court is in a unique position to evaluate juror bias, and given the special capacity of the trial judge to evaluate fixed bias on the part of prospective jurors, that judge's determination in this regard is accorded great deference." *Sharrow*, 2008 VT 24, ¶ 11 (quotation and alterations omitted). As we have repeated before, "there are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." *Herrick*, 2011 VT 94, ¶ 17 (quotation omitted).

¶ 31. In light of this deferential standard, we cannot conclude that the trial court abused its discretion in declining to excuse E.R. for cause on the basis of her initial, but subsequently repudiated, uncertainty about whether she could set aside her views about drugs. E.R.'s repeated assurances that she could, in fact, follow the court's instructions and the trial court's articulated observation that the juror did not appear to be struggling with

the court's questions about whether she could follow the court's instructions provide additional support for this conclusion.

¶ 32. Although defendant also argues on appeal that E.R. was unfairly biased on account of her discomfort with the notion that defendant was not obligated to testify, defendant did not object to E.R. on that basis below. In fact, after an initial back-and-forth with E.R. on the topic, defense counsel asked her to "think about it for a minute," and then changed subjects. Defense counsel did not return to this line of questioning to give E.R. an opportunity to share her evolving thoughts, move to excuse E.R. for cause on the basis of her statements about the defendant's obligation to testify, or take any other action that would have put the court on notice that this issue was still on the table, which would have given the court the opportunity to ask any clarifying questions.

¶ 33. Parties may raise for-cause challenges to prospective jurors any time before the jury is impaneled, V.R.Cr.P. 24(b), and " 'the right to challenge a juror is waived by a failure to object before the jury is impaneled if the basis for the objection is known or might, with reasonable diligence, have been discovered during voir dire.' " *State v. Koveos*, 169 Vt. 62, 66, 732 A.2d 722, 725 (1999) (quoting *In re Nash*, 158 Vt. 458, 467, 614 A.2d 367, 372 (1991)) (alteration omitted). We therefore evaluate the trial court's failure to excuse E.R. on the basis of her beliefs regarding the presumption of innocence for plain error. V.R.Cr.P. 52(b); *Koveos*, 169 Vt. at 66, 732 A.2d at 725. Plain error exists "only in extraordinary situations where it is obvious and strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." *Koveos*, 169 Vt. at 66-67, 732 A.2d at 725 (quotation omitted).

¶ 34. We conclude that the trial court's failure to excuse E.R. did not constitute such a miscarriage of justice. Early on in the voir dire, E.R. acknowledged that if a defendant did not tell his side of the story, she would not be able to "let go" of that fact. Later, in the context of the questioning about her feelings concerning illegal drug use, E.R. apologized and acknowledged, "This is all new to me." In that exchange, E.R. had initially expressed misgivings about the impact of her feelings about drug dealing on her view of the case, but she was clear and unequivocal in affirming her ability to follow the court's instructions when the court asked her directly whether she could do so. With respect to

the issue concerning defendant testifying, she never got a chance to consider or answer whether, if the situation arose, she could set aside the fact that defendant did not take the stand to tell his side of the story if the court specifically instructed her to do so, and never got the chance to revisit the matter at all after defense counsel asked her to "think about it for a minute." Under these circumstances, we cannot conclude that the trial court's failure to, sua sponte, excuse E.R. on account of her answer to the question about defendant testifying was such an obvious error, striking at the heart of defendant's constitutional rights as to warrant reversal.

B.

¶ 35. Defendant also argues on appeal that the trial court should have dismissed juror J.T. for cause. The questionnaire completed by prospective jurors prior to the jury selection asked for them to disclose whether any family members were affiliated with any of various listed law enforcement entities. At the beginning of the jury draw, the court allowed individual voir dire with several prospective jurors, including J.T. J.T. had indicated on the questionnaire that she had a family member who worked at a Vermont correctional facility. In the individual voir dire, the state's attorney engaged in the following back-and-forth with J.T.:

Q. You also indicated in your questionnaire . . . that either someone in your family or immediate family has worked . . . as a correctional officer employed by the State of Vermont?

A. Correct.

Q. And who would that person be?

A. My brother.

Q. Okay. Do you live with him?

A. No.

Q. Okay. How often do you see him?

A. Two or three times a month.

Q. And how long has he been employed as a correctional officer, to the best of your knowledge?

A. A little over five years.

Q. Have you spoken to him regarding Jonathon Bruno?

A. No.

Q. Has he spoken to you?

A. No.

Q. Have you been instructed by the judge as to asking people to not talk to you about the case and not reading material? Are you prepared to do that should he bring up anything regarding Jonathan Bruno?

A. Yes.

¶ 36. Defendant sought to remove J.T. for cause. His challenge did not focus on the fact that J.T.'s brother was a correctional officer but, rather, rested on the premise that the line of questioning to which J.T. was subjected effectively disclosed to her the highly prejudicial fact, not otherwise to be disclosed to the jury, that defendant was incarcerated. The trial court denied the motion. The court noted the absence of any evidence of fixed or implied bias, and rejected the suggestion that the line of questioning necessarily supported the inference that defendant was incarcerated. The court noted that the questionnaire from which the information about J.T.'s brother was drawn asked jurors to disclose connections to a host of different types of law enforcement personnel.

¶ 37. We evaluate the trial court's determination for abuse of discretion. *Sharrow*, 2008 VT 24, ¶ 11. We recognize that exposing the jury to a defendant in shackles, or otherwise emphasizing a defendant's incarcerated status, may in some cases undermine the presumption of innocence that is essential for a fair trial. *State v. Lee*, 2008 VT 128, ¶ 27, 185 Vt. 110, 967 A.2d 1161. In this case, the trial court did not abuse its discretion in concluding that the brief, routine questioning of J.T. regarding her brother's employment as a correctional officer did not support the inference that defendant must be incarcerated. *Id.* ¶ 28 (holding that trial court did not abuse its discretion in declining to order mistrial on basis of speculation that jury knew that defendant was incarcerated). Even if J.T. might have concluded on the basis of the state's attorney's questions that defendant had at some time been incarcerated, "[a] brief reference to a defendant's incarcera-

tion is not enough . . . to undermine the presumption [of innocence] and cause a mistrial." *Id.* ¶ 27.[3]

## III.

¶ 38. Finally, we consider defendant's challenge to the jury instruction concerning diminished capacity. In July 2007, defendant consulted a physician who specializes in treating substance-abuse addiction for help with his heroin addiction; the physician prescribed Suboxone, which reduces the craving for heroin. That physician testified that two months later defendant was talking fast and could not stay on topic. Defendant testified after he started Suboxone he began using crack cocaine throughout the summer and fall of 2007. The physician testified that on October 30, 2007, the day before the killing, defendant was very agitated; he spoke quite rapidly, he bounced from topic to topic, he had perceptions that bordered on paranoia, and his thought content was only marginally reality-based. Defendant testified that prior to the incident he smoked crack at a friend's house before going to Walmart in the afternoon. On the basis of this and other evidence, defendant argued to the jury that he had diminished capacity — that is, his mental illness and substance abuse affected his state of mind and impaired his capacity to form the necessary intent at the time of the altercation with the victim.

¶ 39. The court provided the parties with draft jury instructions, which they reviewed with the court the morning of closing arguments. Defendant made only one objection pertinent to the issues now raised on appeal, and in response, the court altered the charge. After the court made the change, defense counsel acknowledged that the change satisfied the defense's concerns. The relevant portions of the court's instructions to the jury concerning diminished capacity are as follows:

---

[3] On appeal, defendant also suggests without further argument that the fact that J.T.'s brother worked at the correctional facility where defendant was held was itself a reason to remove J.T. for cause. Defendant did not raise this argument below, so we review for plain error. *Koveos*, 169 Vt. at 66, 732 A.2d at 725. In the absence of any evidence at all of actual bias arising from J.T.'s brother's status, we are left to consider whether this connection supports a challenge predicated on implied bias. *Sharrow*, 2008 VT 24, ¶ 7. The law infers bias when, "irrespective of the answers given on voir dire, the prospective juror has such a close relationship with a participant in the trial — a witness, a victim, counsel, or a party — that the potential juror is presumed unable to be impartial." *Id.* ¶ 14. J.T.'s link to her brother who, in turn, may or may not have contact with defendant could not support a challenge on the basis of implied bias.

Mr. Bruno is charged with second-degree murder, which requires the State to prove that he acted with a wanton disregard of the likelihood that death or great bodily harm would result. Evidence that he was under the influence of drugs and that he suffered from a mental condition may be relevant in determining whether he had the mental capacity to form this intent, and whether he actually did so.

You must consider all of the evidence, including any evidence of mental condition and cocaine intoxication, in reaching your decision.

The mitigating circumstance of diminished capacity does not justify the killing, but may only lessen the level of the offense from second degree murder to manslaughter. . . .

. . . .

At the same time, you may find that the degree of crime is reduced from second-degree to voluntary manslaughter if Mr. Bruno's mental state was influenced by extenuating circumstances, such as diminished capacity, or sudden passion, or great provocation that would cause a reasonable person to lose self-control.

¶ 40. In the second-degree murder instruction the court also defined the requisite state of mind with more specificity: "It is more than extreme negligence. The State must have proven that Mr. Bruno was actually aware of the risk of death or great bodily harm and that he ignored that risk."

¶ 41. Defendant makes two arguments on appeal. First, he contends that the instruction was confusing and failed to give the jury clear direction about what to do if it found that defendant's capacity was diminished such that he could not form the requisite intent. In particular, he points to the statements that support that he was under the influence of drugs and that he suffered from a mental condition "may" be relevant in determining whether he had the requisite mental capacity, and that the mitigating circumstance of diminished capacity "may only lessen the level of the offense" from second-degree murder to manslaughter. Second, he argues that the court's reference in the voluntary manslaughter

instruction to "a reasonable person" in proximity to its reference to diminished capacity improperly instructed the jury to apply an objective rather than subjective test in considering whether defendant had diminished capacity.

¶ 42. We have described "diminished capacity" as "a mental disability of the defendant at the time of the alleged commission of the offense which precludes or prevents the defendant from forming a specific intent or having the required state of mind which is an essential element of the offense." *State v. Wheelock*, 158 Vt. 302, 311, 609 A.2d 972, 977 (1992); see also *State v. Williams*, 2010 VT 83, ¶ 20, 188 Vt. 413, 8 A.3d 1053 (identifying the "critical connection between diminished capacity and intent").[4]

¶ 43. On appeal, "We review jury instructions in their entirety to determine if they sufficiently guided the jury and did not have a prejudicial impact on their deliberations." *State v. Jones*, 2008 VT 67, ¶ 23, 184 Vt. 150, 955 A.2d 1190. We have recognized that "[t]here is no error if the jury charge as a whole conveys the true spirit and doctrine of the law, and there is no fair ground to say the jury has been misled by it." *State v. Streich*, 163 Vt. 331, 352-53, 658 A.2d 38, 53 (1995) (quotation omitted). Because defendant did not make these objections to the jury instruction below, we review for plain error. *State v. Tahair*, 172 Vt. 101, 104-05, 772 A.2d 1079, 1082 (2001); *Wheelock*, 158 Vt. at 306, 609 A.2d at 975 (explaining that preservation rule gives trial court "one last opportunity to avoid an error"). And, as noted above, "[p]lain error will be found only in rare and extraordinary cases where the error is obvious and strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." *Streich*, 163 Vt. at 353, 658 A.2d at 53.

¶ 44. Applying this deferential standard, we do not find plain error in the trial court's instruction. The instruction made it clear that an essential element of the second-degree murder

---

[4] We recognize that we have also framed diminished capacity as a defense that mitigates the degree of homicide from murder to voluntary manslaughter without tying it as tightly to its impact on intent. *State v. Sexton*, 2006 VT 55, ¶ 13, 180 Vt. 34, 904 A.2d 1092; *State v. Blish*, 172 Vt. 265, 270-71, 776 A.2d 380, 385 (2001). Our analysis in this case is the same under either framework, and this appeal for plain error analysis that does not directly implicate the issue is not a propitious vehicle for reconciling the arguably disparate threads of our jurisprudence on the issue.

charge was the requisite intent of wantonness, and that evidence that defendant was under the influence of drugs and that he suffered from a mental condition may be relevant in determining whether he had the mental capacity to form that intent. The court specifically instructed the jury that if the State failed to prove *each* of the essential elements of second-degree murder, then it was required to consider whether defendant was guilty of one of the lesser manslaughter offenses. The instructions advised the jury *twice* that if it found diminished capacity, it could not convict of second-degree murder. We cannot agree with defendant's argument that this instruction failed to tell the jury what it was required to do if it found that defendant's capacity was diminished such that he could not form the requisite intent.

¶ 45. Likewise, we cannot agree that the specific language cited by defendant — some of which was expressly endorsed by defendant at the charge conference — is so confusing as to constitute plain error. The court's instruction that defendant's drug use or mental condition *may* be relevant in assessing his mental capacity, and *may* lessen the offense to manslaughter reflects the court's recognition that whether or not those conditions sufficiently interfered with his capacity to form the requisite intent to qualify as "diminished capacity" was a question for the jury.

¶ 46. Nor do we agree that the language cited by defendant in the voluntary manslaughter charge impermissibly instructed the jury to apply an objective standard in its diminished capacity analysis. In its instruction concerning voluntary manslaughter, the trial court stated:

> The last essential element of voluntary manslaughter is that, in causing the death of [the victim], Mr. Bruno acted with a wanton disregard of the likelihood that death or great bodily harm would result even if Mr. Bruno's mental state was influenced by mitigating and extenuating circumstances, including diminished capacity, or sudden passion, or great provocation that would cause a reasonable person to lose self-control.[5]

---

[5] In his brief, defendant refers to the manslaughter instruction in connection with this claim of error. However, the accompanying record citation points to similar but substantially different language within the second-degree murder charge. We

The reference to the impact on a "reasonable person" in this instruction is most reasonably interpreted to refer neither to the list as a whole, nor, in particular, to the diminished capacity factor.

¶ 47. We reach this conclusion for several reasons. First, the context of the reference is the likelihood that something would "cause a reasonable person to lose self control." The concept of losing self control makes sense in response to a great provocation, or even a sudden passion. But diminished capacity, as described above, refers to one's ability to form certain states of mind, not to the ability to control one's actions. Moreover, the court's further explication of the concepts of "sudden passion" and "great provocation" both expressly direct the jury to apply a reasonable-person standard; its further explanation of diminished capacity does not. In fact, the second-degree-murder instruction advises the jury — twice — to consider whether he had the capacity, and whether he *actually* did have the necessary intent or awareness. This is a subjective standard. Finally, the multiple references in the discussion of diminished capacity to defendant's intoxication and mental illness — both defendant-specific conditions — would make little sense in the context of an "objective" analysis. Viewing the jury instruction in its entirety, we do not agree that it improperly called for the application of an objective standard in the diminished capacity analysis. *Jones*, 2008 VT 67, ¶ 23.

¶ 48. For the foregoing reasons, we conclude that the challenged jury instruction did not result in plain error.

*Affirmed.*

evaluate defendant's claim based on the text of his brief rather than the cited transcript section.