2014 VT 129

## State of Vermont v. Latonia Congress

[114 A.3d 1128]

No. 11-307

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed December 5, 2014

Motion for Reargument Denied January 12, 2015

*Thomas J. Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** This case requires us to decide whether, in a murder prosecution, a jury can find a defendant guilty of voluntary manslaughter, as opposed to murder, on the basis of evidence that the defendant's actions were influenced by a serious psychological condition that does not rise to the level of insanity and does not negate the defendant's specific intent to kill. It also obliges us to reconcile disparate strands of our case law concern-

ing the effect of what is often described as "diminished capacity" evidence in the context of a homicide prosecution. We conclude that the trial court correctly declined to instruct the jury that it could consider the evidence of defendant's psychological condition as a basis for convicting her of voluntary manslaughter, and reject defendant's challenges on appeal to several of the trial court's evidentiary rulings. Accordingly, we affirm.

I.

¶ 2. A jury convicted defendant Latonia Congress of second-degree murder following a trial. The evidence relevant to the issues on appeal can be summarized as follows. In October 2009, defendant lived in a house in Essex Junction with her husband; their three children; her husband's sister, Helena Copeland; a friend, Shateena Morris; and four of defendant's cousin's children, including sixteen-year-old Shatavia Alford. Copeland described defendant as "sweet," and testified that defendant took care of all of the kids in the house before worrying about herself. Copeland described defendant's relationship with Shatavia as close, recalling that the two played and sang together, and that defendant paid for Shatavia's clothes, school events, and anything else she wanted.

¶ 3. Copeland testified that she was at the house with Shatavia and several younger children on the afternoon of October 16, 2009, when defendant telephoned, spoke with Shatavia, and shortly thereafter arrived home. Defendant "came storming in" and went straight to Shatavia, yelling at her about something related to their phone conversation, and then about the latter's responsibilities around the house. Defendant slapped Shatavia, and the two began punching each other and pulling each other's hair until Copeland and Morris separated the two and tried to calm them down. Defendant slipped free, said, "I'm going to kill that bitch," and stood behind the kitchen counter looking at Shatavia. Thinking that defendant and Shatavia had calmed down, Copeland turned away and moments later heard Shatavia scream. She turned around and saw Shatavia jumping up and down with blood spraying from her chest and a knife falling to the floor. Inferring that defendant had thrown the knife at Shatavia, Copeland called 911. While speaking to the police, she heard defendant repeatedly tell the victim that she was sorry.

¶ 4. A recording of the 911 call was played for the jury and admitted into evidence. A police officer arrived during the call, and

Copeland can be heard telling him that defendant and Shatavia had been fighting, that Copeland had attempted to intervene, and that she had heard defendant say, "I'm going to kill that bitch."

¶ 5. The first police officer on the scene testified that after he transferred care of Shatavia to the rescue squad, he heard defendant talking on the phone, crying, and saying several times that "this is just a dream, this can't be happening." She urged the person on the other end of the line to go to the hospital and check on Shatavia and said, "I don't know what happened." She slumped to the ground for a period, and when asked what had occurred, defendant repeatedly stated that "[i]t happened so fast, I don't know" but also acknowledged that she and Shatavia had been fighting.

¶ 6. Shatavia was transported to a hospital where she was pronounced dead. A medical examiner testified that she died from a stab wound to the heart that severed her pulmonary artery. The wound was three to five inches in depth and could not, in the medical examiner's opinion, have been caused by a thrown knife. The examiner also noted some injuries to the victim's fingers that were consistent with defensive wounds.

¶ 7. Morris, the other adult who observed the altercation, testified for the defense, recalling that defendant and Shatavia had enjoyed a close "mother-daughter" type of relationship. Morris had seen them "debate" about chores, but had never heard defendant use abusive language with Shatavia, nor seen her become violent with or strike Shatavia. Although Morris was present at the time of the offense, she did not hear defendant threaten to kill Shatavia. Morris testified that defendant's husband was extremely abusive, physically and emotionally, and described in detail a time when he got on top of defendant and punched her repeatedly.

¶ 8. Morris was not alone in testifying about such abuse. Defendant's aunt recalled that she repeatedly heard defendant's husband verbally abuse defendant, and described several instances in which she saw him physically hit her, including while she was pregnant. She spoke about a time when defendant's husband ripped wires out of defendant's car and ripped her shirt because he did not want her going to church. Several of defendant's friends testified that her husband repeatedly called her names and yelled at her, and they described incidents in which he tried to strike her, ripped her clothes, restrained her by sitting on her,

followed her in his car, removed a license plate from a van to prevent her from driving it, and tried to prevent her from leaving the house. One friend explained that when her husband was away, defendant was outgoing and fun, but when he was around, she "goes into a shell" and "shuts down." Defendant's husband testified as well, acknowledging that he had frequently struck, choked, and beat defendant with a belt. He explained that he didn't feel good about his actions, but he was upset at the time, and he suggested that as his wife, she should follow his instructions.

¶ 9. Defendant testified on her own behalf. She described how she came to be the principal care provider for her own three children and her cousin's four children, including Shatavia. She acknowledged that she had not given birth to Shatavia, but described her as "my oldest daughter" and "my other half." Defendant confirmed that her husband had physically and emotionally abused her for many years, and described various incidents including one in which he hit her on the side of the head and broke her eardrum, more than one when he hit her while she was pregnant, and one in which he sliced her dress open with a razor blade to prevent her from going to a wedding reception. With respect to the events surrounding Shatavia's death, she recalled that she had an argument with Shatavia, that Shatavia struck her, and that they started fighting, but she could not remember what happened thereafter until she saw Shatavia lying on the ground bleeding and tried to pull her up to take her to the hospital.

¶ 10. Philip J. Kinsler, Ph.D., a clinical and forensic psychologist, testified as defendant's expert. Dr. Kinsler explained that he had reviewed the case records, interviewed defendant on five separate occasions for a total of fourteen to fifteen hours, and administered a number of psychological tests. Dr. Kinsler testified that the tests indicated that defendant had "enormously elevated" levels of psychological trauma; strong indicators of depression and dissociation; and a composite I.Q. of 77, which is among the lowest six percent of the population. He concluded that, at the time of the events in question, defendant suffered from "acute stress disorder" (an early stage of post-traumatic stress disorder), and "as a component of" that disorder, suffered from "dissociative amnesia." Dr. Kinsler explained that, as a result of her history of extreme abuse, defendant "went into a dissociative state" when she became embroiled in the fight with Shatavia so that she was

not aware of how she was acting and could not remember what occurred. It was his opinion that she reacted "automatically and without conscious control," and would not have been "able to control her actions to conform with the law." The dissociative response would have been the same, according to Dr. Kinsler, regardless of who "struck the first blow."

¶ 11. The State called Albert M. Drukteinis, M.D., a forensic psychiatrist, as a rebuttal witness. Dr. Drukteinis disputed that defendant was suffering from any mental disease or defect at the time of the killing, although he acknowledged that his opinion was limited to psychoses causing hallucinations or delusions and acknowledged that it was "very possible" defendant had PTSD. He did not believe that psychiatry had the "tools" to know whether defendant's dissociation occurred during or after the events, or whether she could control her actions.

## II.

¶ 12. The central issue on appeal involves the jury instructions as they relate to defendant's evidence that she suffered from a psychological condition that prevented her from controlling her actions. In addition to an instruction on insanity, defendant requested that the jury instructions address her psychological condition as an extenuating circumstance mitigating what would otherwise be a conviction for murder to manslaughter. The trial court responded that the evidence of defendant's condition either did or did not negate specific intent. The court's proposed instructions reflected that if the jury concluded that the psychological condition did negate defendant's specific intent, that would defeat the State's ability to prove the essential elements of first-degree murder, second-degree murder, *and* voluntary manslaughter, the specific intent requirement for voluntary manslaughter being the same as for second-degree murder. If the jury concluded that the condition did not negate defendant's specific intent, the trial court asked rhetorically what was left to consider: "How can you have a little bit of intent if it says 'specific intent'?" Through counsel, defendant argued that even if the jury did not conclude that the evidence of defendant's mental condition negated her *specific intent*, it would be misleading to define the extenuating circumstances mitigating murder to manslaughter to include only heat of passion and provocation without also including a mental condition that does not rise to the level of insanity but may decrease a person's faculties and awareness.

¶ 13. The trial court rejected defendant's position. With reference to defendant's insanity defense, the trial court instructed: "To sustain a defense of legal insanity, . . . Congress must have proven . . . that she suffered a mental disease or defect at the time of the alleged offense and, second, that as a result of a disease or defect she was unable to appreciate the criminality of her conduct or she was unable to conform her conduct . . . to the requirements of the law." With respect to the difference between second-degree murder and voluntary manslaughter, the court instructed that the first four elements of the two charges were the same, and explained: "You may find that the degree of crime is reduced from second-degree murder to voluntary manslaughter if [defendant's] mental state was influenced by extenuating circumstances such as a sudden passion or . . . provocation that would cause a reasonable person to lose self-control." The court further instructed, "If you find the State has failed to prove any of the first four essential elements" — including specific intent — "then you must find [defendant] not guilty of voluntary manslaughter as well."

¶ 14. The jury returned a verdict of guilty on the charge of second-degree murder. Defendant renewed her objection to the jury instruction in a motion for judgment of acquittal or a new trial, which the trial court denied. The trial court's decision not to give the requested instruction aligning evidence of defendant's mental condition alongside provocation as a factor that would mitigate second-degree murder to voluntary manslaughter is defendant's primary ground for appeal.

¶ 15. The trial court and defendant both relied on the guidance of this Court in making their respective arguments. The fact is, as set forth more fully below, we have sent mixed signals on the question. We are now called upon to "reconcil[e] the arguably disparate threads of our jurisprudence" concerning the effect of "diminished capacity" evidence in the context of a homicide prosecution. *State v. Bruno*, 2012 VT 79, ¶ 42 n.4, 192 Vt. 515, 60 A.3d 610.

¶ 16. At the outset, we note two important provisos. First, while terms such as "diminished capacity" can be helpful in describing a particular concept or set of concepts, they can also be misleading. Across jurisdictions, and even within jurisdictions, the term "diminished capacity" has varied meanings and significance. See generally E. Nevins-Saunders, *Not Guilty as Charged: The Myth*

*of Mens Rea for Defendants with Mental Retardation*, 45 U.C. Davis L. Rev. 1419, 1456 (2012) (noting that "[d]iminished capacity has so many different iterations in jurisdictions across the country that it is somewhat difficult to define succinctly."); J. Compton, Note, *Expert Witness Testimony and the Diminished Capacity Defense*, 20 Am. J. Trial Advoc. 381, 387-94 (1997) (describing four distinct approaches taken by different states in connection with the diminished capacity defense). Moreover, in some circumstances a decision to apply the label, or to reject the label, may appear to determine an outcome, obscuring the underlying considerations connecting a factual scenario to a legal conclusion. We necessarily rely on decisions and commentaries relating to "diminished capacity" in our analysis, but the ultimate question before us is not what does or does not qualify for the label "diminished capacity" or what effect that label has on the legal framework of a particular case. Rather, it is whether defendant in this case was entitled to an instruction that would have allowed the jury to convict defendant of voluntary manslaughter rather than second-degree murder on the basis of her psychological condition even if it concluded that defendant's evidence did not negate the State's proof of her specific intent.

¶ 17. Second, the question before us is not whether the evidence of defendant's psychological condition is legally relevant to the charge of second-degree murder. It clearly is in at least two ways. The trial court properly instructed the jury that the State bore the burden of proof on all essential elements of its case and that proving that defendant had the requisite state of mind when she killed her niece was one of those elements. The court instructed:

> If you decide that at the time of the offense, [defendant] was suffering from a mental condition not amounting to insanity which prevented her from forming the required mental state or states, then she is not guilty of any of the crimes of first degree murder, second degree murder and voluntary manslaughter.

> The cause of a mental condition is not relevant. Furthermore, if you have a reasonable doubt about whether [defendant] was capable of forming the required mental state or states, then you must give her the benefit of that doubt and find her not guilty of the three specific crimes mentioned.

The court went on to explain that the requisite mental state for murder and voluntary manslaughter is an intent to kill, or an intent to do great bodily harm, or a wanton disregard of the likelihood that death or great bodily harm would result. If the jury concluded that as a result of defendant's mental condition it had a reasonable doubt as to whether she had (or was able to form) the intent to kill or do great bodily harm, or the necessary wanton disregard, it was instructed to acquit of first-degree murder, second-degree murder, and voluntary manslaughter.

¶ 18. Moreover, the jury was instructed that if it decided that defendant had proven by a preponderance of the evidence that she "suffered from a mental disease or defect at the time of the alleged offense and either that the mental disease or defect rendered her incapable of appreciating the criminality of the alleged offense or that she was incapable of conforming her conduct to the requirements of the law at the time of the alleged defense," then it must find defendant not guilty by reason of insanity.

¶ 19. The question before us is whether, *in addition* to potentially establishing insanity or negating the State's evidence of her intent, evidence of defendant's mental condition could reduce defendant's potential criminal liability from second-degree murder to voluntary manslaughter even if the jury concluded the State had shown beyond a reasonable doubt that she had the requisite specific intent for second-degree murder.[1]

### A.

¶ 20. ■ We first consider the evolution of our own decisions concerning the elements of murder and manslaughter. The common law generally defined murder as "the unlawful killing of a person with 'malice aforethought.'" *State v. Johnson*, 158 Vt. 508, 515, 615 A.2d 132, 136 (1992) (citation omitted). In the nineteenth century, many states, including Vermont, enacted statutes dividing murder into degrees in order "to graduate punishment on the basis of culpability and to narrow the category of capital offenses." *Id.* at 515, 615 A.2d at 136. Thus, our homicide statute, which has

---

[1] For this reason, the dissent's suggestion that the question in this case is whether to recognize or abrogate a "diminished capacity" defense is inaccurate. The question before us is not whether evidence of a diminished mental capacity may be relevant to reduce legal responsibility; the question is what standards apply, and what consequences ensue.

remained unchanged for over a century, provides that "[m]urder committed by means of poison, or by lying in wait, or by wilful, deliberate and premeditated killing," or "in perpetrating or attempting to perpetrate" certain specified felonies, "shall be murder in the first degree," and "[a]ll other kinds of murder shall be murder in the second degree." 13 V.S.A. § 2301. The premeditated form of first-degree murder requires an intent *to kill. Johnson,* 158 Vt. at 518, 615 A.2d at 137-38. Second-degree murder may be predicated on an intent to kill, an intent to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may cause death or great bodily harm.[2] *State v. Sexton,* 2006 VT 55, ¶ 12, 180 Vt. 34, 904 A.2d 1092.

¶ 21. ▮ Equally well-established under the common law of Vermont and elsewhere is the offense of manslaughter. This Court explained in an early case:

> Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation, which in tenderness for the frailty of human nature the law considers sufficient to palliate the [offense]; or involuntary, as when the death of another is caused by some unlawful act, not accompanied with any intention to take life.

*State v. McDonnell,* 32 Vt. 491, 545 (1860) (quotation and emphasis omitted), *overruled on other grounds by State v. Burpee,* 65 Vt. 1, 8, 25 A. 964, 966 (1892). Our prior cases frequently stated that "[t]he element that distinguishes murder from manslaughter is the presence or absence of malice." *State v. Shaw,* 168 Vt. 412, 415, 721 A.2d 486, 490 (1998); see also *State v. Hatcher,* 167 Vt. 338, 345, 706 A.2d 429, 433 (1997) (same); *State v. Wheelock,* 158 Vt. 302, 310, 609 A.2d 972, 977 (1992) (noting that voluntary manslaughter is "the intentional killing of another" under "extenuating circumstances affecting a defendant's state of mind [that] negate malice").

¶ 22. Our case law through the years has not clearly defined malice, or clearly explained how, if at all, it is different from

---

[2] To avoid confusion, when we use the term "specific intent" in the context of second-degree murder or voluntary manslaughter, we intend to encompass all three of these types of intent.

intent or from the absence of cognizable extenuating circumstances. In *Johnson*, we noted:

> Manslaughter is generally defined as an unlawful killing of a person absent malice aforethought. In straightforward terminology, voluntary manslaughter is an intentional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control.

158 Vt. at 518 n.4, 615 A.2d at 138 n.4 (citation omitted). In other words, we essentially concluded that "malice" is simply a stand-in for "absence of extenuating mitigating circumstances."

¶ 23. Although we described the common-law concept of "malice" in *Johnson*, we simultaneously abandoned the term and concluded that the various levels of criminal liability for homicide are better described with reference to the states of mind required for each:

> Our holding does suggest that continued use of the archaic and arcane language associated with the word "malice" could only be a source of confusion to jurors. Accordingly, because the term "malice aforethought" has no real meaning other than denoting various mental states, and because it has been the source of much confusion in the case law and in jury instructions, the trial courts should refrain from using the term in jury instructions. Rather than describing malice as a requisite element of murder, the trial courts should indicate *the appropriate states of mind* required for each type of murder.

*Id.* at 519, 615 A.2d at 138 (emphasis added; citations and footnote omitted). Our statement in *Johnson* signaled that "intent" and the presence or absence of extenuating circumstances are the relevant state-of-mind factors differentiating second-degree murder, voluntary manslaughter, and involuntary manslaughter.

¶ 24. In a number of post-*Johnson* decisions we have continued to describe malice as an element distinguishing second-degree murder from voluntary manslaughter. See, e.g., *Shaw*, 168 Vt. at 415, 721 A.2d at 490 ("The element that distinguishes murder from manslaughter is the presence or absence of malice."); see

also *Hatcher*, 167 Vt. at 345, 706 A.2d at 433 (same). In others, we substituted the term "willfulness" for malice as the factor distinguishing murder from voluntary manslaughter, and described it as the element negated by extenuating circumstances such as passion or provocation. See *State v. Blish*, 172 Vt. 265, 270, 776 A.2d 380, 385 (2001) ("It is well established in Vermont that '[v]oluntary manslaughter is an intentional killing committed under extenuating circumstances that may negate willfulness, such as sudden passion or provocation that would cause a reasonable person to lose control.'") (alteration in original); *State v. Shabazz*, 169 Vt. 448, 451-52, 739 A.2d 666, 668 (1999) (citing *Hatcher*, 167 Vt. at 345, 706 A.2d at 433). On other occasions, we have equated "malice" with specific intent. See, e.g., *Sexton*, 2006 VT 55, ¶ 14 ("the elusive term 'malice,' . . . has long been the distinct mens rea — the specific intent — separating murder from manslaughter.").

¶ 25. ■ ■ These various attempts to use or define malice have not created more clarity, and are unnecessary. Although we must grapple with our diverse uses of the term malice in analyzing our past decisions, we need not carry the term forward. If malice is synonymous with "specific intent," we can simply use the term "specific intent." If it signals the absence of extenuating or mitigating circumstances, then we can simply describe the absence of extenuating or mitigating circumstances in identifying the elements of second-degree murder versus voluntary manslaughter. In the context of levels of homicide liability, "malice" is not, in any event, a separate element independent of intent and the absence of extenuating, mitigating circumstances, and we need not invoke the term, or try to define it, in order to distinguish between second-degree murder and voluntary manslaughter.[3] We reiterate our holding in *Johnson*: "[V]oluntary manslaughter is an inten-

---

[3] We have contemplated the possibility that "malice" might itself be an independent state-of-mind element that distinguishes second-degree murder from voluntary manslaughter — above and beyond intent or the absence of cognizable extenuating circumstances. But we cannot divine what it might mean. In *Johnson* we rejected the suggestion that "malice aforethought" was synonymous with "archaic phrases such as 'evil disposition,' 'wicked purpose,' and 'heart fatally bent on mischief,'" as those phrases do not approximate the term's literal meaning in modern times, "and indeed it is doubtful that an 'ill-will' element was ever required for a murder conviction." *Johnson*, 158 Vt. at 515, 615 A.2d at 136. The term cannot connote the opportunity for reflection, because such reflection is the defining feature of premeditation — an element of first-degree murder, but not second-degree murder.

tional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control." 158 Vt. at 518-19 n.4, 615 A.2d at 138 n.4.

## B.

¶ 26. ■ Given this framework, the question remains whether the kind of mental condition ascribed to defendant in this case can support a jury instruction that allows conviction for voluntary manslaughter. That "sudden passion or provocation that would cause a reasonable person to lose control" is an extenuating circumstance that allows a jury to convict for voluntary manslaughter instead of second-degree murder is black-letter law. *Hatcher*, 167 Vt. at 345, 706 A.2d at 433. The question is whether this is the only type of extenuating circumstance recognized by our law.

## 1.

¶ 27. In the case of *State v. Duff*, this Court reversed a conviction because the trial court's instructions did not adequately inform the jury that evidence of a diminished mental capacity could be a basis for a conviction of voluntary manslaughter. 150 Vt. 329, 554 A.2d 214 (1988), *overruled on other grounds, State v. Powell*, 158 Vt. 280, 284, 608 A.2d 45, 47 (1992). This Court wrote:

> In Vermont, there are at least two ways in which malice may be negated in the context of a homicide prosecution. First, a jury may find malice to be absent by reason of sudden passion or great provocation. Second, a jury may find malice to be absent by reason of a defendant's diminished capacity. The latter is predicated

---

See *State v. Reuschel*, 131 Vt. 554, 558, 312 A.2d 739, 741 (1973) (" 'Every premeditated act is, of course, a wilful one; and deliberation and premeditation simply mean that the act was done with reflection and conceived beforehand. No specific length of time is required for such deliberation.' ") (quoting *State v. Carr*, 53 Vt. 37, 46 (1880)). Nor is malice synonymous with awareness of the law or the ability to act in accordance with it. Under our scheme, these factors define sanity. 13 V.S.A. § 4801(a)(1). But see *People v. Poddar*, 518 P.2d 342, 348 (Cal. 1974) (person acts with "malice" when his or her conduct is "likely to cause death or serious injury" and is taken despite awareness of duty to act within the law and ability to act in accordance with the law), *superseded by statute*, 1981 Cal. Stat. 1591, *as recognized in People v. Saille*, 820 P.2d 588, 592-93 (Cal. 1991).

> upon a finding by the jury that the defendant suffered from mental disabilities, not necessarily amounting to insanity, which operated to preclude a capability of forming a state of mind (in this case, malice) which is an essential element of the greater offense charged.

*Id.* at 331, 554 A.2d at 215 (citations omitted).

¶ 28. This Court repeated this statement of the law in *State v. Shaw*, describing the two ways to defeat the required state-of-mind elements of second-degree murder: "The first is by reason of sudden passion or provocation; the second is by reason of a defendant's diminished capacity." 168 Vt. at 415, 721 A.2d at 490. We further explained:

> Diminished capacity is predicated on finding that the defendant suffered from mental disabilities which prevented him from forming the state of mind — in this case, malice — which is an essential element of the greater offense charged. Thus, sudden passion or great provocation is not an essential element of voluntary manslaughter.

*Id.* at 416, 721 A.2d at 490 (citation omitted).

¶ 29. Likewise, in *State v. Wheelock* we explained that "*[v]oluntary* manslaughter is the intentional killing of another human being done with a state of mind of 'sudden passion or great provocation,' *or some other mental state caused by 'diminished capacity.'* " 158 Vt. at 310, 609 A.2d at 977 (second emphasis added). The central issue in *Wheelock* involved the relevance of defendant's intoxication to his self-defense claim, but the Court noted without concern that the trial court had given the jury an opportunity to convict on the lesser charge of voluntary manslaughter on account of defendant's intoxication with the following instruction:

> In general, diminished capacity refers to a mental disability of the defendant at the time of the alleged commission of the offense which precludes or prevents the defendant from forming a specific intent or having the required state of mind which is an essential element of the offense. . . . [It] results in malice being negated
>  . . . .
>
>  . . . .

. . . [D]iminished capacity recognizes that voluntary consumption of drugs or alcohol or both may impair a person's mental functioning to such an extent as to prevent that person from forming the specific intent or intents that are a necessary element of the offenses.

. . . .

. . . [I]n considering diminished capacity, you should look to the evidence as you find it to be with regard to the extent of the Defendant's ingestion of alcohol and or drugs and the evidence as to the observed effects upon him and determine to what degree his mental ability to form the specific intent was impaired.

*Id.* at 311, 609 Vt. at 977-78 (alterations in original).

¶ 30. In all of the above cases, this Court stated that evidence of a diminished mental capacity could defeat a conviction for second-degree murder by undermining the State's proof of the essential state-of-mind element for second-degree murder. This Court suggested an alternative rationale in the more recent case of *State v. Sexton*, in which we wrote:

We have long held that diminished capacity due either to voluntary intoxication or to a mental disability can mitigate murder to voluntary manslaughter. The traditional rationale supporting a diminished capacity defense posits that a defendant's decreased faculties or awareness may preclude the specific intent to commit murder, thus reducing the crime to voluntary manslaughter. In *State v. Blish*, however, we announced that "the intent component of voluntary manslaughter is the same as that required for second degree murder." We went on to state that the "critical factor distinguishing second degree murder from voluntary manslaughter is not the mental state of the actor, but the existence of mitigating circumstances." Thus, we adopted the position that "the correct way of explaining [diminished capacity] is as a defense mitigating the degree of homicide from murder to voluntary manslaughter."

2006 VT 55, ¶ 13 (alteration in original) (citations omitted).

¶ 31. However, in its subsequent analysis the Court reverted to the traditional state-of-mind rationale for allowing the evidence of diminished mental capacity:

> The common law allows the defense of diminished capacity — due either to intoxication or mental defect — to specific intent crimes, and we have consistently made the defense available to negate the specific intent necessary to commit second-degree murder. All three prongs of the mens rea required for second-degree murder — intent to kill, intent to cause great bodily harm, or wanton disregard of the likelihood that one's conduct would naturally cause death or great bodily harm — simply define the term "malice," which has always been a species of specific intent. The State's arguments are therefore unavailing, and defendant is entitled to present evidence that his diminished capacity, due either to voluntary intoxication or mental disability, prevented him from forming the specific intent to commit second-degree murder.

*Id.* ¶ 17 (citations omitted).

¶ 32. Most recently, in *State v. Williams*, we reiterated that "[t]here are two bases for mitigating first- or second-degree murder to voluntary manslaughter": (1) adequate provocation and (2) "a defendant's diminished capacity due to mental disabilities that do not necessarily amount to insanity." 2010 VT 83, ¶¶ 10-11, 188 Vt. 413, 8 A.3d 1053. We explained that "[t]he 'traditional rationale' for such mitigation is that 'a defendant's decreased faculties or awareness may preclude [the defendant's ability to form] the specific intent to commit murder.'" *Id.* ¶ 11 (quoting *Sexton*, 2006 VT 55, ¶ 13). We explained that the diminished capacity defense "necessarily requires consideration of a particular defendant's ability to form the intent to kill," and stated that "[i]t is elemental that there must be a nexus between a defendant's mental condition — in this case, defendant's alleged cognitive deficits, dissociative state, jealous delusion, and voluntary intoxication — and [the defendant's] ability to form the intent required for murder." *Id.* ¶¶ 13-14. Because the evidence did not support a sufficient nexus between defendant's various mental impairments and his ability to form the intent required for murder, we concluded that the defendant was not entitled to an instruction concerning the impact of his claimed diminished capacity. *Id.* ¶ 14.

¶ 33. ▮ Significantly, with the exception of the one statement noted in *Sexton*, we ascribed significance to diminished-capacity evidence in all of the above cases on the basis that the evidence can undermine the State's proof of malice, which we understood to be the requisite state of mind, or its proof of specific intent. We were right in those cases to acknowledge that evidence of intoxication or a serious mental condition can defeat the State's proof with respect to the state-of-mind requirement for second-degree murder. What we failed to recognize in those decisions, and what has become clearer as our law has evolved, is that a defendant who defeats the State's burden with respect to the state-of-mind element for second-degree murder cannot be convicted of *any* degree of homicide more serious than involuntary manslaughter.

¶ 34. ▮ We have recognized that what used to be described as "malice" is not some separate state of mind independent of intent and the absence of extenuating circumstances. Moreover, "we have specifically held that the intent component of voluntary manslaughter is the *same* as that required for second degree murder — actual intent to kill, intent to do serious bodily injury, or extreme indifference to human life." *Blish*, 172 Vt. at 272, 776 A.2d at 386 (emphasis added) (citing *Shabazz*, 169 Vt. at 453, 739 A.2d at 669). If the State fails to meet its burden to prove the requisite intent for second-degree murder, then it has necessarily failed to prove the requisite intent for voluntary manslaughter.[4] Given these considerations, if defendant in this case presented evidence that persuaded the jury that the State had not met its burden of proof with respect to her ability to form the intent to kill, cause serious bodily injury, or act with wanton disregard of the likelihood that her conduct would naturally cause death or great bodily harm, then she was entitled to be acquitted of *both* second-degree murder and voluntary manslaughter. That is exactly what the trial court instructed. Given the framework that this Court has repeatedly relied upon for considering evidence of

---

[4] To the extent that we suggested otherwise in *Duff*, *Shaw*, *Wheelock*, *Sexton*, *Williams*, and a host of other prior cases, we hereby overrule that aspect of those decisions. The problem with those decisions is not that they allowed the jury to convict on a lesser charge in the face of evidence of diminished capacity that undermined the State's evidence with respect to the defendant's intent; the problem is that they suggested that the appropriate lesser charge was voluntary manslaughter, as opposed to involuntary manslaughter.

diminished mental capacity in the context of a homicide prosecution, there would be no analytical basis for an instruction that allowed a jury to convict defendant for voluntary manslaughter if it concluded on account of the evidence of her diminished mental capacity that the State had not met its burden to prove the state-of-mind element for second-degree murder.

2.

¶ 35. As noted above, we have in some prior decisions suggested an alternate framework for considering evidence of a diminished mental capacity in homicide cases that is not moored to proof of the defendant's intent. This suggestion first surfaced in a concurring opinion in which Justice Morse wrote:

> Although we have spoken previously of diminished capacity as "negating" malice, the correct way of explaining its effect is as a defense mitigating the degree of homicide from murder to voluntary manslaughter. Like second degree murder, voluntary manslaughter is an intentional killing, but, unlike second degree murder, it is "committed under extenuating circumstances that would mitigate, but not justify, the killing."

> "Diminished" is not "eliminated." It would be improper for the jury to acquit defendant because his capacity to develop a specific intent to kill was diminished. Rather, the diminished capacity defense operates only to lessen the culpability for the killing, not excuse it altogether.

*State v. Pelican*, 160 Vt. 536, 543, 632 A.2d 24, 28-29 (1993) (Morse, J., concurring) (citations omitted). Justice Morse thus argued that evidence that reduces one's culpability, but does not actually negate specific intent, can reduce criminal liability from second-degree murder to voluntary manslaughter.

¶ 36. Several years later, the Court cited Justice Morse's concurrence in *Pelican* for the proposition that the correct way to explain the effect of diminished capacity evidence " 'is as a defense mitigating the degree of homicide from murder to voluntary manslaughter,' " and suggesting that the evidence may reflect " 'extenuating circumstances that would mitigate, but not justify, the killing.' " *Blish*, 172 Vt. at 270-71, 776 A.2d at 385 (quoting *Pelican*, 160 Vt. at 543, 632 A.2d at 28-29 (Morse, J., concurring)).

In *Sexton*, this Court cited this prior discussion in *Blish*, and adopted the position that " 'the correct way of explaining [diminished capacity] is as a defense mitigating the degree of homicide from murder to voluntary manslaughter.' " 2006 VT 55, ¶ 13 (alteration in original) (citation omitted).

¶ 37. ▮▮▮ This statement of the law has the virtue of making sense of a host of our prior decisions suggesting that evidence of a diminished mental capacity can "mitigate" a defendant's criminal liability from murder to manslaughter. But we conclude that this Court has not adopted it, and should not adopt it, for several reasons. First, although we have described this alternative framework in two prior opinions — *Blish* and *Sexton* — we have never truly applied it. *Blish* did not involve evidence of a defendant's diminished mental capacity. To the extent we purported to adopt a new framework for evaluating diminished capacity evidence in that case, our statements on the subject were beyond the scope of the issue squarely before us. In *Sexton*, the issue was squarely presented, and we did state clearly our adoption of this new framework. 2006 VT 55, ¶ 13. However, in our subsequent discussion in *Sexton*, we reverted to a traditional mode of analysis and specifically tied the relevance of the diminished capacity evidence to its tendency to negate the State's proof of defendant's specific intent. *Id.* ¶ 17. Then, in *Williams*, we quoted *Sexton*'s articulation of the traditional rationale for considering diminished capacity evidence — tying it to the State's burden to prove intent — without acknowledging that we had purported to *abandon* that rationale in *Sexton*. 2010 VT 83, ¶ 11. For these reasons, we conclude that, despite the mixed signals in our recent cases, the rationale for allowing a jury to consider evidence of a defendant's diminished mental capacity in a homicide case, whether due to intoxication or a mental condition, remains squarely tied to the tendency of such evidence to negate the State's proof of intent.

¶ 38. We decline to depart from this established framework for several reasons. First, absent the touchstone of the State's burden to prove intent, we have no standards for evaluating the relevance of such evidence. If the State proves intent to kill beyond a reasonable doubt, what factors would a jury consider in deciding whether evidence of diminished mental capacity was an extenuating circumstance warranting mitigation of criminal liability from murder to voluntary manslaughter? The dissent rightly points out that for decades Vermont juries have been ably considering

diminished capacity and the question of whether a defendant's diminished capacity in a particular case should mitigate an offense that would otherwise amount to second-degree murder to voluntary manslaughter. *Post*, ¶ 67. But they have been doing so pursuant to instructions that link the defendant's mental capacity to his or her state of mind. The trial court offered just such an instruction here, and recognized that a diminished capacity that prevented the defendant from forming the requisite intent would not only defeat a conviction for second-degree murder but would also be inconsistent with a conviction for voluntary manslaughter.

¶ 39. Second, even though the conclusion that such evidence can "mitigate murder to manslaughter" would not be inconsistent with many of our prior decisions, the rationale on which we would rely in getting there would be a substantial departure from our longstanding framework for considering the levels of homicide. Although the Legislature has left development of Vermont's law of homicide largely to the common law, and thus given this Court substantial leeway to develop the law in this area, see, e.g., *Johnson*, 158 Vt. at 519 n.5, 615 A.2d at 138 n.5, we conclude that a shift of this magnitude would be more appropriately initiated by the Legislature.[5]

¶ 40. ▮ We do not deny the instinct, noted by the dissent, that a defendant so severely compromised by mental or emotional trauma that he or she lacks the normal capacity for self-control may be less culpable. *Post*, ¶ 58. Our decision leaves ample room for this consideration. Evidence of a defendant's diminished mental capacity may support an insanity defense; may defeat the State's proof of intent to kill, thus reducing a defendant's maximum criminal liability for homicide to involuntary manslaughter; and may be highly relevant in sentencing. Our decision here does not prevent a jury or judge from considering such evidence for a host of purposes, allowing the judge and jury to act on the exact instinct to which the dissent articulately gives voice.

---

[5] The dissent cites a section of the Model Penal Code in support of its position. *Post*, ¶ 64. It would be difficult to apply individual sections of the Model Penal Code to a case like this because the overall framework of Vermont's homicide statute does not track that of the Model Penal Code. Adoption of the Model Penal Code's framework concerning homicide may be desirable, but an overhaul of our homicide law of that magnitude is best left to the Legislature.

## III.

¶ 41. Defendant's several remaining claims do not require the same extended discussion as the first. Defendant contends that the trial court erred in excluding the testimony of Copeland's brother, defendant's brother-in-law. The recording of the 911 call captured Copeland telling the officer at the scene that defendant and the victim had been fighting, that Copeland had attempted to intervene, and that shortly thereafter Copeland heard defendant say, "I'm going to kill that bitch." At a bail hearing about a year later, however, Copeland testified that she recalled the fight between defendant and the victim but could not remember what, if anything, defendant had said at the time.

¶ 42. Copeland later left Vermont and could not be located by the State until a few weeks before trial. The defense was afforded an opportunity to depose Copeland shortly before her trial testimony, in which she again recalled defendant saying, "I'm going to kill that bitch." When asked by the prosecutor why her testimony about defendant's statement differed from her testimony at the bail hearing, Copeland said that it was because she had been threatened by defendant's sisters.

¶ 43. The defense cross-examined Copeland on inconsistencies between her testimony about the incident at trial and her statement to the investigating officers after the incident. Copeland identified a document presented by the defense as a copy of her "interview." When defense counsel asked "Your interview with who?" she replied, "Well, I can't really read it because I don't have my glasses." She went on to acknowledge that she had reviewed the interview with the State just a few minutes prior to her testimony.

¶ 44. The defense proceeded to cross-examine Copeland on inconsistencies between her prior and current statements. Copeland acknowledged several inconsistencies between her trial testimony and her prior statements to the investigators, but attributed them to the difficulty of remembering events that had occurred more than a year before. Defense counsel, in response, asked Copeland if she had problems with her memory, whether she had "difficulties in school," or had attended "special classes," all of which Copeland denied. Later, when asked why she had moved from New York to Vermont, Copeland stated that her brother had been abusing her.

¶ 45. At the end of the first day of defense testimony, the defense indicated that it intended to call Copeland's brother as a witness. The following day, the State moved to exclude this testimony as late-noticed. The defense countered that Copeland's brother was called as a rebuttal witness to address certain "new information" elicited from Copeland's testimony, specifically "that she couldn't read because she didn't have [her] glasses, that she never had any kind of special education classes," and that she had been abused by the brother. The trial court indicated that it considered these matters to be "collateral" but invited briefing. The defense argued that Copeland's brother's testimony was admissible to impeach Copeland by "contradiction with extrinsic evidence" under V.R.E. 608(b), as well as to provide an opinion on Copeland's character for truthfulness or untruthfulness under V.R.E. 608(a). The trial court ultimately excluded the proffered "contradiction" testimony as "extrinsic and collateral," and barred the character testimony because Copeland's brother had not been listed as a witness by the defense.

¶ 46. Defendant contends the trial court erred in excluding this testimony pursuant to V.R.E. 608(b), arguing that the testimony was admissible for purposes of impeachment by contradiction of Copeland's factual testimony. Defendant cites the advisory committee note to Federal Rule of Evidence 608(b), the model for Vermont Rule of Evidence 608(b), which explains that "the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness" and not "to bar extrinsic evidence for bias, competency and contradiction impeachment." Advisory Committee Notes – 2003 Amendments, F.R.E. 608; see also *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995) ("Impeachment by *contradiction* is a recognized mode of impeachment not governed by Rule 608(b)."); *United States v. Rodriguez*, 539 F. Supp. 2d 592, 595 (D. Conn. 2008) ("Impeachment by contradiction, as opposed to evidence of a witness's character for truthfulness or untruthfulness, is a permissible exception to the general proscription of Rule 608(b).").

¶ 47. ■ Whatever the merits of that argument, it is equally well recognized that "'a witness may not be impeached by extrinsic evidence (contradiction by another witness or evidence) on a collateral issue.'" *United States v. Tarantino*, 846 F.2d 1384, 1409 (D.C. Cir. 1988) (emphasis added) (quoting *United States v.*

*Pugh*, 436 F.2d 222, 225 (D.C. Cir. 1970)); accord *Perez-Perez*, 72 F.3d at 227 ("[E]xtrinsic evidence to impeach is only admissible for contradiction where the prior testimony being contradicted was itself material to the case at hand."); see also *Rosario v. Kuhlman*, 839 F.2d 918, 925-26 (2d Cir. 1988) ("The determinative question in deciding whether extrinsic evidence contradicting a witness's testimony is admissible is . . . whether the assertions that the impeaching party seeks to contradict are . . . material or collateral."). Furthermore, "the trial court retains wide latitude to impose reasonable limits on cross-examination" into "collateral issues" or matters only "marginally relevant." *State v. Brochu*, 2008 VT 21, ¶¶ 80-87, 183 Vt. 269, 949 A.2d 1035 (quotations omitted).

¶ 48. ▆▆▆ The record here amply supports the trial court's conclusion that the areas of Copeland's testimony that defendant sought to contradict through Copeland's brother's testimony — whether Copeland needed glasses to read the police statement the defense showed her at trial, had attended special classes in high school, or was abused by her brother — were all collateral matters without even a tenuous connection to Copeland's testimony about what she observed in connection with the events at issue in this case. In contrast, the accuracy of Copeland's testimony and her credibility concerning the events in question were substantially tested by the defense through close cross-examination comparing her statements at the time of the incident and several which she gave later, and exploring her relationship with the victim, defendant, and defendant's husband (her other brother) to suggest reasons why she might resent defendant. In addition, the defense specifically challenged Copeland's claim that she changed her testimony at the bail hearing because of threats; the defense called defendant's sister to testify that neither she nor defendant's other sisters had ever made any threats to Copeland. Accordingly, we find no basis to conclude that the trial court abused its discretion, or deprived defendant of any substantial right, in excluding as collateral the proffered testimony in question.

## IV.

¶ 49. ▆▆▆ Equally unavailing is defendant's claim that the trial court erred in excluding Copeland's brother as a character

witness. The defense has an obligation to disclose, on request of the prosecuting attorney, the names and addresses of witnesses they intend to call at trial, V.R.Cr.P. 16.1(c), and, "if a witness is not timely revealed to the State, the trial court may limit the witness' testimony or exclude the witness altogether." *State v. Verrinder*, 161 Vt. 250, 255, 637 A.2d 1382, 1386 (1993); see also V.R.Cr.P. 16.2(g)(1) (where party has violated discovery rule, court may enter such "order as it deems just under the circumstances"). The trial court's determination to exclude a witness "is discretionary and will not be disturbed unless the defendant shows a clear abuse of discretion." *State v. Meyers*, 153 Vt. 219, 224, 569 A.2d 1081, 1085 (1989).

¶ 50. ▋ While acknowledging that Copeland's brother was not on the defense witness list, defendant nevertheless asserts that the trial court's decision was an abuse of discretion because the need for his testimony was not apparent until Copeland's last-minute deposition. The argument is unpersuasive. As the trial court observed in its order denying defendant's motion for new trial, the importance of Copeland's credibility as a witness was well-known from the inception of the case, and Copeland's brother's integral role as defendant's brother-in-law was or should have been equally apparent. See, e.g., *State v. Hugo*, 156 Vt. 339, 344-45, 592 A.2d 875, 879 (1991) (holding that exclusion of untimely-disclosed witness "was within the trial court's discretion" where the witness, defendant's father, "could have been uncovered and disclosed earlier" and his proffered testimony was largely cumulative); *State v. Edwards*, 153 Vt. 649, 649, 569 A.2d 1075, 1076 (1989) (mem.) (upholding trial court's exclusion of two defense witnesses disclosed the day before trial because they "were close relatives of the defendant and their evidence could have been uncovered and disclosed earlier," "the testimony from the witnesses would have been cumulative," and defendant had ample opportunity to give earlier notice).

¶ 51. ▋ Furthermore, the defense did not, as required by Vermont Rule of Evidence 103(a)(2), make an offer of proof stating "the substance of the evidence" offered: i.e., what Copeland's brother would have testified to, and whether it was to take the form of an opinion or reputation testimony. We therefore have no basis to determine whether the evidence would have substantially assisted the defense. *State v. Ringler*, 153 Vt. 375,

378, 571 A.2d 668, 670 (1989) (reaffirming principle requiring "an offer of proof to be made before error may be predicated upon a ruling excluding evidence"). Accordingly, we find no basis to conclude that the trial court abused its discretion in excluding the witness.

## V.

¶ 52. Lastly, defendant contends the trial court misapplied Vermont Rule of Evidence 703 in barring Dr. Kinsler from testifying about the facts on which he based his opinions unless they were already in evidence. The background to the claim was as follows. The State had moved before trial to limit Dr. Kinsler's testimony in several respects, including any testimony recounting the statements of persons he had interviewed. The State was concerned, in particular, about information conveyed to Dr. Kinsler by defendant and others "regarding past abuse" by defendant's husband. At a pretrial hearing on the motion, the court noted that the issue was governed by Rule 703, which addresses the factual bases of opinion testimony by expert witnesses. Rule 703 provides, in part, that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."

¶ 53. While defense counsel maintained that the probative value of any potential hearsay testimony far outweighed its prejudicial effect, defense counsel also acknowledged that, "by the time Dr. Kinsler testifies . . . it will all be a moot point" because the information at issue would already be admitted. The court also recognized the likelihood that the matter would be a "non-issue," but was clear nevertheless that it was "not going to have [defendant's] background introduced through Mr. Kinsler. That is something that has got to be admitted independently." The court subsequently explained its view more specifically: "If the crux of this defense is that [defendant] acted . . . because of post-traumatic stress disorder which was itself caused . . . by someone abusing her, then there has to be independent evidence of that. We're not going to float it up there in midair for the jury to speculate about."

¶ 54. Following the hearing, the court memorialized its decision in a written ruling, stating its understanding that Dr. Kinsler's

testimony would be "based to great extent on the information he gathered personally from . . . [d]efendant," that the court anticipated the State would be strongly interested in "testing" this information "through cross-examination," and therefore that Dr. Kinsler would not be allowed to refer to the information unless it was already in evidence or elicited by the State through cross-examination.

¶ 55. In any event, defense counsel's prediction that the matter would be a nonissue was correct. Defendant, her husband, and her friends and family members testified extensively and in significant detail concerning the physical and emotional abuse that defendant's husband had inflicted on her. Later, as defendant's last witness, Dr. Kinsler testified over the course of almost an entire day about his five interviews with defendant; separate meetings with defendant's husband and other friends and family; eight psychological tests that he administered to defendant and their results; and other material that he had reviewed, such as police reports and witness statements. His testimony included defendant's descriptions of her husband's physical and emotional abuse, as well as her relationship with the victim and other family members. Dr. Kinsler also testified extensively about defendant's specific memories of the events surrounding the homicide, and how those memories had informed his decision on which psychological tests to administer and how he interpreted the results leading to his diagnoses.

¶ 56. ▪▪ ▪▪ The foregoing record notwithstanding, defendant contends the trial court committed prejudicial error in precluding Dr. Kinsler's testimony about the facts underlying his opinions without determining whether their probative value outweighed their prejudicial effect, pursuant to Rule 703. The claim is unavailing for two reasons. First, contrary to defendant's claim, it is reasonably clear that the trial court weighed the probative value of the information of principal concern to the parties — defendant's extensive history of domestic abuse — and concluded that it did not outweigh the potential prejudice of admitting the evidence through Dr. Kinsler "for the jury to speculate about" without affording the State the opportunity to test the information first-hand. This balancing of probative value versus unfair prejudice is precisely the sort which is committed to the trial court's "broad" discretion, and defendant has not shown that the court "either completely withheld its discretion or exercised it on grounds

clearly untenable or unreasonable." *State v. Shippee*, 2003 VT 106, ¶ 13, 176 Vt. 542, 839 A.2d 566 (mem.).

¶ 57. ▪ Second, defendant has not identified any specific information on which Dr. Kinsler relied in forming his opinions that was not admitted as a result of the court's ruling. Although defendant argues on appeal that "[t]he limitations on Dr. Kinsler's testimony crippled his ability to explain his opinion to the jury," defendant has not explained what information Dr. Kinsler relied on that was *not* in evidence and testified-to by Dr. Kinsler himself. Thus, there is simply no basis for a finding of error, and no grounds to disturb the judgment. *State v. McGuigan*, 2008 VT 111, ¶ 21, 184 Vt. 441, 965 A.2d 511 (stating that to warrant disturbing judgment, claimed error — "be it of constitutional or nonconstitutional dimension" — must have affected party's "substantial rights").

*Affirmed.*

¶ 58. **Reiber, C.J.**, dissenting. The majority hold that forty years of Vermont law entrusting juries with the discretion to reduce murder to manslaughter based on evidence of a defendant's diminished capacity rests on a meaningless semantic distinction — an analytic flaw — which once revealed compels its complete abandonment. As Holmes famously observed, however, the law is not built on ordered logic; it is built on human experience.[6] At bottom, the law's recognition that a defendant's compromised mental condition may mitigate murder to manslaughter reflects a basic human instinct correlating punishment with fault. We innately perceive that, even if technically "sane," a defendant so severely compromised by mental or emotional trauma that he or she lacks the normal capacity for self-control may be less culpable, and therefore deserving of the lesser — though not insubstantial — retribution reserved for manslaughter. The doctrine of diminished capacity simply recognizes that we are all human, and all deserving of the law's mercy.

¶ 59. The majority maintain, nevertheless, that at least six decisions of this Court plus "a host of other prior cases" recognizing the defense of diminished capacity must be "overrule[d]" in order to avoid "a substantial departure from our

---

[6] "The life of the law has not been logic; it has been experience." O.W. Holmes, Jr., The Common Law 1 (1881).

longstanding [homicide] framework." *Ante,* ¶¶ 34 n.4, 39. This is paradoxical, to say the least. If a decision to overrule four decades of settled law is not a "departure" from our established homicide framework, I cannot imagine what is.

¶ 60. Certainly our reasoning has been inconsistent, which may help to explain the majority's uncertainty in deciding whether we are reaffirming prior law or overruling it. But I think that this tension reveals something else: a fundamental misunderstanding of the issue at the heart of this case. The essential question here is not, as the majority suggests, whether "malice" continues to imply something more than intent; it probably does not. Nor is the question whether some of our decisions were logically inconsistent in characterizing diminished capacity as intent-negating when voluntary manslaughter actually requires an intent to kill; they probably were.

¶ 61. What the majority overlook is that all of these decisions — however occasionally imperfect their logic — recognized a murder defendant's basic right to persuade a jury to reduce the offense to manslaughter based on evidence of diminished capacity resulting from a mental disease or defect not amounting to insanity. The essential question here is why? Why has this Court consistently — until today — recognized this right? Understand this, and we may begin to understand how best to characterize such evidence, whether it be malice-negating, intent-negating, or something else entirely.

¶ 62. The answer begins with the common-law crime of manslaughter based on heat of passion, which this Court described more than 150 years ago in language that cannot be improved on today: an offense "committed with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation, which in tenderness for the frailty of human nature the law considers sufficient to palliate the [offense]." *State v. McDonnell,* 32 Vt. 491, 545 (1860) (quotation and emphasis omitted), *overruled on other grounds by State v. Burpee,* 65 Vt. 1, 8, 25 A. 964, 966 (1892). Over time, the notion that human "frailty" may "palliate" an offense from murder to manslaughter extended to other circumstances, including — most notably — diminished capacity, which we early defined as "legally applicable to [mental] disabilities not amounting to insanity . . . to reduce the degree of the crime rather than to excuse its commission." *State v. Smith,* 136 Vt. 520, 527, 396 A.2d 126, 130 (1978).

¶ 63. Despite the various unpersuasive efforts over time to correlate diminished capacity with one or another element of murder — ably dissected by the majority — the fact remains that, like heat of passion, it constitutes in essence an "extenuating circumstance" permitting a jury to "palliate" or "mitigate" the offense from murder to manslaughter. See *State v. Johnson*, 158 Vt. 508, 518-19 n.4, 615 A.2d 132, 138 n.4 (1992) ("In straightforward terminology, voluntary manslaughter is an intentional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control."). Indeed, Justice Morse was absolutely correct, as well as remarkably prescient, in anticipating this issue twenty years ago in *State v. Pelican*, when he observed as follows:

> Although we have spoken previously of diminished capacity as "negating" malice, the correct way of explaining its effect is as a defense mitigating the degree of homicide from murder to voluntary manslaughter. Like second degree murder, voluntary manslaughter is an intentional killing, but, unlike second degree murder, it is committed under extenuating circumstances that would mitigate, but not justify, the killing.

160 Vt. 536, 543, 632 A.2d 24, 29 (1993) (Morse, J., concurring) (quotation omitted); see also *State v. Blish*, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001) (noting that the "critical factor" distinguishing murder from manslaughter is "the existence of mitigating circumstances").

¶ 64. Diminished capacity thus operates precisely like heat-of-passion; it is not tied to a particular state-of-mind element but rather allows the jury to reduce the crime from second-degree murder to voluntary manslaughter if it concludes that the offense was committed under the influence of a mental disease or defect not resulting in insanity. This understanding not only reinforces Justice Morse's clarifying insight in *Pelican*, and our observation in cases like *Blish*, concerning the critical distinction between murder and manslaughter. It also closely complements the definition of manslaughter endorsed by the distinguished authors of the Model Penal Code — and enacted in several states — as "a homicide which would otherwise be murder . . . committed under the influence of extreme mental or emotional disturbance for

which there is reasonable explanation or excuse . . . determined from the viewpoint of a person in the actor's situation under the circumstances as [the actor] believes them to be." Model Penal Code § 210.3 (1980).

¶ 65. As succinctly summarized by New York's high court, "[t]he purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them." *People v. Patterson*, 347 N.E.2d 898, 907 (N.Y. 1976); see also *State v. Dumlao*, 715 P.2d 822, 829 (Haw. Ct. App. 1986) (noting that Hawaii's manslaughter definition based on the Model Penal Code essentially "merge[d] the two concepts of heat of passion and diminished capacity"); *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky. 1986) (explaining that "[e]xtreme emotional disturbance for which there is a reasonable explanation . . . reduces the degree of a homicide from murder to manslaughter [and] [i]n that respect . . . serves the same function as 'acting in sudden heat of passion' "). Even in England, the source of so much of our common law, murder must be reduced to manslaughter if the jury finds that the defendant "was suffering from such abnormality of mind . . . as substantially impaired [his or her] mental responsibility for [the] acts and omissions in doing . . . the killing." Homicide Act, 1957, 6 & 7 Eliz. 2, c. 11, pt. I, § 2(1). As one scholar has explained, the English Homicide Act — like the Model Penal Code — "broadly sets out a policy for judges and juries to apply in assessing culpability, but does not use legally defined mental states as intermediaries." P. Dahl, *Legal and Psychiatric Concepts and the Use of Psychiatric Evidence in Criminal Trials*, 73 Calif. L. Rev. 411, 440 (1985).

¶ 66. What prevents the majority from embracing this clear and straightforward approach and reaffirming a defense that has been available to Vermont defendants for nearly forty years? The majority assert that it would mark a "substantial departure" from Vermont law, yet recognize at the same time that we have continually — if not always consistently — characterized diminished capacity as fundamentally a defense in mitigation. The authority for this approach is plain. No dramatic "departure" is required to recognize it.

¶ 67. Perhaps a different concern animates the majority, however — the concern implicit in their suggestion that this under-

standing of diminished capacity lacks sufficient "standards" and thus leaves too much discretion to the jury. *Ante,* ¶ 38. But if so the premise is flawed. This Court's shifting explanations for the doctrine notwithstanding, Vermont juries have applied the defense of diminished capacity for nearly forty years, and I am not aware of any suggestion, much less evidence, of jury nullification or confusion. There is simply no basis to believe that ordinary Vermonters are incapable of sensibly evaluating a plea in mitigation based upon evidence of significant mental trauma, to determine whether in the particular factual circumstances it warrants a reduction in the defendant's culpability.

¶ 68. Moreover, taken to its logical conclusion, the majority's belief that a defense divorced from the specific elements of murder lacks adequate "standards" would just as logically compel abrogation of heat-of-passion manslaughter, which we similarly define as a defense in mitigation — "an intentional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control." *Johnson,* 158 Vt. at 518-19 n.4, 615 A.2d at 138 n.4. All that distinguishes the two doctrines, in this sense, is the "reasonable person" test, an extraordinarily thin basis of distinction.

¶ 69. Indeed, the notion that heat-of-passion manslaughter might provide a more reliable or objective standard — predicated on whether a "reasonable" person would have been sufficiently provoked to kill — has been shown to be wholly illusory. The idea that, in assigning criminal culpability, a jury should largely ignore the mental state of the particular defendant and focus on whether a "reasonable" person would have committed the homicide has been aptly described as "absurd." As one commentator has cogently observed:

> "[I]t seems absurd to say that the reasonable man will commit a felony the possible punishment for which is imprisonment for life. To say that the "ordinary man" will commit this felony is hardly less absurd. . . .
>
> Surely the true view of provocation is that it is a concession to the 'frailty of human nature' in those exceptional cases where the legal prohibition fails of effect. It is a compromise, neither conceding the propriety of the act nor exacting the full penalty for it."

*Dumlao,* 715 P.2d at 827 (quoting G. Williams, *Provocation and the Reasonable Man,* 1954 Crim. L. Rev. 740, 742); see also *State v. Ott,* 686 P.2d 1001, 1005 (Or. 1984) (observing that the traditional heat-of-passion defense "placed the jury in the conceptually awkward (to put it kindly) position of having to determine when it is reasonable for a reasonable man to act unreasonably"); A. Donovan et al., *Is the Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation,* 14 Loy. L.A. L. Rev. 435, 451 (1981) (noting "paradox . . . inherent in the use of the reasonable standard to test criminal responsibility: the presence or absence of criminal intent is determined by a standard which ignores the mental state of the individual accused").[7]

¶ 70. The notion that juries are reliably guided by identifiable public standards in deciding whether an "ordinary" or "reasonable" person would have intentionally killed under the circumstances is thus questionable, to say the least, and certainly provides no more objective guidance than expert evidence focused on the accused's state of mind. Indeed, as one scholar has noted, focusing on the accused's mental or emotional status actually "simplif[ies] the jury's task because the inquiry into the accused's own mental state is more concretely grounded in reality than are conjectures about a mythical reasonable man." Donovan, *supra,* at 458.

¶ 71. Accordingly, I would hold that the trial court erred in refusing to instruct on diminished capacity where — as here — the record evidence amply supported such an instruction. Indeed, the facts here present a textbook case for the jury's consideration of the diminished capacity defense. Based on numerous interviews with defendant and others, a clinical psychologist testified at length concerning defendant's "enormously elevated" levels of psychological trauma resulting from a horrific history of domestic abuse. He concluded that defendant consequently suffered from "acute stress disorder," entered a "dissociative state" when she became embroiled in a physical confrontation with the victim, and reacted "automatically and without conscious control" in attacking

---

[7] Tellingly, the defense of heat-of-passion or provocation originally "turned on the individual accused's state of mind as revealed by all relevant facts and circumstances of the individual's case" and was only modified to the so-called "reasonable" person standard when judges gave the decision to juries as "a device which promoted the myth of the objective, value-free nature of the criminal law." Donovan, *supra,* at 447-48.

the victim with deadly force. The evidence was more than sufficient to warrant an instruction on diminished capacity, allowing the jury to determine whether defendant acted under the influence of a mental disease or defect not rising to the level of insanity.

¶ 72. In light of this evidence, furthermore, it is impossible to conclude that the error was harmless. Defendant's claim of diminished capacity was a central theory of the defense. "A defendant is entitled to have the court present a defense based on the evidence to the jury squarely, that they might confront it, consider it, and resolve its truth or falsity by their verdict." *State v. Drown*, 148 Vt. 311, 312, 532 A.2d 575, 576 (1987) (quotation omitted). The trial court's instruction on manslaughter here entirely omitted from the jury's consideration defendant's core defense. Under any standard of fundamental fairness, this cannot be found to be harmless beyond a reasonable doubt, and compels reversal of the judgment. See *State v. Duff*, 150 Vt. 329, 333, 554 A.2d 214, 216 (1988) (reversing second-degree murder conviction based in part on court's incomplete charge on diminished capacity, which referenced only heat of passion).

¶ 73. Today's decision to abandon the settled defense of diminished capacity defies common sense, reason, and authority. Although our descriptions of the doctrine have not always been consistent, our commitment to its intrinsic justice has never wavered. This is because, like all good common-law principles, its source does not lie in case books — but in the human heart. The law is diminished if we forget this.

## On Motion for Reargument

¶ 74. Appellant moves for reargument of this Court's December 5, 2014 decision, in which we concluded "that the trial court correctly declined to instruct the jury that it could consider the evidence of defendant's psychological condition as a basis for convicting her of voluntary manslaughter." *State v. Congress*, 2014 VT 129, ¶ 1, 198 Vt. 241, 114 A.3d 1128. In seeking reargument, appellant argues for the first time that applying this holding retroactively to her, rather than prospectively only, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In so arguing, appellant relies upon *Rogers v. Tennessee*, in which the United States Supreme Court held that due process concerns prohibit retroactive application of "a judicial

alteration of a common law doctrine of criminal law . . . only where [the alteration] is 'unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue.'" 532 U.S. 451, 462 (2001) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)). In *Rogers*, the Court determined in relevant part that the Due Process Clause did not prohibit retroactive application of a state court decision abolishing a common law doctrine that precluded a defendant from being convicted of murder unless the victim died within a year and a day of the defendant's act. 532 U.S. at 466-67. The Court reasoned that the state court decision was not "a marked and unpredictable departure from prior precedent," but rather "a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense." *Id.*

¶ 75. The situation is similar here. As we explained in our opinion, many of our prior decisions suggesting that evidence of a defendant's diminished mental capacity can "mitigate" criminal liability from murder to voluntary manslaughter defined the necessary diminution in mental capacity with reference to its effect on a defendant's ability to form the necessary intent. *State v. Congress*, 2014 VT 129, ¶ 33. This Court has never clearly applied a framework under which diminished capacity could "mitigate" criminal liability from murder to manslaughter without negating the required intent element. *Id.* ¶ 37. Thus, our decision not to allow an instruction that would have permitted the jury in this case to convict defendant of voluntary manslaughter even if it concluded that she had the necessary intent was neither unexpected nor indefensible by reference to our law as expressed before the act in question. In short, applying our decision to the instant case cannot be construed as "the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." *Rogers*, 532 U.S. at 467. Accordingly, defendant's motion for reargument is denied.